**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

<table>
<tr>
<td>TIFFANY TABARES, individually and as successor-in-interest to Dillan Tabares,<br><br> <i>Plaintiff-Appellant</i>, <br><br> v. <br><br>CITY OF HUNTINGTON BEACH; ERIC ESPARZA, an individual; DOES, 1–10, inclusive,<br><br> <i>Defendants-Appellees.</i> </td>
<td> No. 19-56035<br><br>D.C. No.<br>8:18-cv-00821-<br>JLS-JDE<br><br><br>OPINION </td>
</tr>
</table>

Appeal from the United States District Court
for the Central District of California
Josephine L. Staton, District Judge, Presiding

Argued and Submitted December 7, 2020
Pasadena, California

Filed February 17, 2021

Before: Paul J. Kelly, Jr.,[*] Ronald M. Gould, and
Ryan D. Nelson, Circuit Judges.

Opinion by Judge R. Nelson

---

[*] The Honorable Paul J. Kelly, Jr., United States Circuit Judge for the U.S. Court of Appeals for the Tenth Circuit, sitting by designation.

**SUMMARY**[**]

**Civil Rights**

The panel reversed the district court's summary judgment for defendants on plaintiff's state law negligence claim, and remanded, in an action brought under 42 U.S.C. § 1983 and California law against a police officer arising from the fatal shooting of plaintiff's son, Dillan Tabares.

Huntington Beach police officer Eric Esparza shot Tabares seven times in front of a 7-Eleven after the two were involved in a physical altercation. The district court granted summary judgment for Officer Esparza and the City of Huntington Beach on the § 1983 and state law claims, and plaintiff appealed only her negligence claim.

The panel first noted that California negligence law regarding the use of deadly force overall is broader than federal Fourth Amendment law. Under California law, an officer's pre-shooting decisions can render his behavior unreasonable under the totality of the circumstances, even if his use of deadly force at the moment of the shooting might be reasonable in isolation. Federal law, however, generally focuses on the tactical conduct at the time of shooting, though a prior constitutional violation may proximately cause a later excessive use of force.

The panel held that the district court erroneously conflated the legal standards under the Fourth Amendment and California negligence law. Specifically, the district

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

court: (1) inaccurately concluded that plaintiff did not point to *any* evidence probative of the fact that Tabares exhibited symptoms of mental illness that would have been apparent to Officer Esparza; (2) did not consider that a jury could find Officer Esparza's pre-shooting conduct unreasonable under California law, given Tabares's potential mental illness; and (3) misinterpreted the Ninth Circuit precedent set forth in *Billington v. Smith*, 292 F.3d 1177 (9th Cir. 2002), in assessing the reasonableness of Officer Esparza's conduct at the time of the shooting.

The panel held that plaintiff presented sufficient evidence that Officer Esparza's shooting of Tabares could be found negligent by a reasonable juror under the broader formulation of reasonableness in California law. Considering all evidence in the light most favorable to plaintiff, a reasonable jury could conclude that Officer Esparza should have suspected Tabares had mental health issues and that he unreasonably failed to follow police protocol when dealing with potentially mentally ill persons before using force. Finally, Officer Esparza's decision to shoot Tabares without warning six times—and then a seventh—could be found by a jury to be unreasonable.

**COUNSEL**

Catherine Sweetser (argued), Paul Hoffman, and John Washington, Schonbrun Seplow Harris Hoffman & Zeldes LLP, Los Angeles, California, for Plaintiff-Appellant.

Daniel S. Cha (argued) and Pancy Lin, Senior Deputy City Attorney; Brian L. Williams, Chief Trial Counsel; Michael E. Gates, City Attorney; Office of the City Attorney, Huntington Beach, California; for Defendants-Appellees.

**OPINION**

R. NELSON, Circuit Judge:

Dillan Tabares was fatally shot seven times by a police officer in front of a 7-Eleven. Tiffany Tabares brought federal and California law claims in response to her son's death (appealing only the state negligence claim). We address the material difference between the Fourth Amendment and California negligence law.

In considering the United States Constitution, we must "always regard[] it as unique." *Rhode Island v. Massachusetts*, 37 U.S. 657, 673 (1838). The Constitution is a "singular and solemn . . . experiment" created by one of the finest group of statesmen ever assembled. The Federalist No. 40 (James Madison). It was born of a hard-fought struggle that against all odds wrested a fledgling nation from oppression by the then-greatest empire on earth. The Bill of Rights was adopted in the same vein, championed by James Madison. When we interpret the Fourth Amendment, we ground our jurisprudence in an understanding of the text's original public meaning at ratification and "traditional

standards of reasonableness." *See Virginia v. Moore*, 553 U.S. 164, 168–69, 171 (2008). Above all, Chief Justice Marshall reminds us, "we must never forget that it is a *constitution* we are expounding." *McCulloch v. Maryland*, 17 U.S. 316, 407 (1819).

California negligence law, on the other hand, is the product of common law developed through decisions by California courts. Justice Brandeis famously noted that under our federalist system, "a . . . state may, if its citizens choose, serve as a laboratory; and try novel social and economic experiments without risk to the rest of the country." *New State Ice Co. v. Liebmann*, 285 U.S. 262, 387 (1932) (Brandeis, J., dissenting). The U.S. Constitution and California common law are thus two distinct legal frameworks. "Individual States may surely construe their own [laws] as imposing more stringent constraints on police conduct than does the Federal Constitution." *California v. Greenwood*, 486 U.S. 35, 43 (1988). But "when a State chooses to protect . . . beyond the level that the Fourth Amendment requires," these "additional protections exclusively a[re] matters of state law." *Moore*, 553 U.S. at 171. And the California Supreme Court has held that California negligence law "is broader than federal Fourth Amendment law." *Hayes v. Cnty. of San Diego*, 305 P.3d 252, 263 (Cal. 2013).

The district court erroneously conflated the legal standards under the Fourth Amendment and California negligence law. We hold that Ms. Tabares presented sufficient evidence that Officer Eric Esparza's shooting of Mr. Tabares could be found negligent by a reasonable juror under the broader formulation of reasonableness in

California law.[1]  *See id.* at 258.  Accordingly, we reverse the district court's grant of summary judgment on the negligence claim and remand for further proceedings.

I

On the morning of September 22, 2017, Officer Esparza, a City of Huntington Beach police officer, sat at an intersection in his police vehicle when he noticed Mr. Tabares standing on the sidewalk.[2]  Officer Esparza had never seen Mr. Tabares before, had not received a call for service regarding him, and had no reason to suspect he had a weapon or had committed a crime.

Mr. Tabares caught Officer Esparza's attention for several reasons.  He was wearing a sweater on a warm day, walking abnormally, made fidgeting, flinching movements with his hands, and looked over in Officer Esparza's direction several times.  Simultaneously, Jack Roten, a former police officer standing on the corner, noted Mr. Tabares talking to himself and making gestures with his hands as he passed Roten.  These behaviors made Roten believe Mr. Tabares had mental health issues, though Roten

---

[1] Defendants' counsel characterizes Ms. Tabares's state law negligence claim as a "Hail Mary."  "A Hail Mary pass in American football is a long forward pass made in desperation at the end of a game, with only a small chance of success," *United States v. George*, 676 F.3d 249, 251 (1st Cir. 2012), such as the 41-yard touchdown pass as time expired in BYU's 1980 "Miracle Bowl" victory.  The negligence claim here was not a "Hail Mary" given California law.

[2] Some facts are undisputed, but where a genuine dispute of material fact exists, we recount the facts in the light most favorable to Ms. Tabares.  *Tuuamalemalo v. Greene*, 946 F.3d 471, 474 (9th Cir. 2019).

did not think he was dangerous or threatened Roten's safety.[3]

Officer Esparza decided to talk to Mr. Tabares. He parked at a 7-Eleven towards where Mr. Tabares was walking and exited his vehicle. He then asked Mr. Tabares to stop walking to talk. Mr. Tabares responded "no" and told Officer Esparza to leave him alone while continuing to walk away.

Officer Esparza decided to detain Mr. Tabares for an unspecified reason and instructed him to stop walking away multiple times. Philip Azevedo, a customer at the 7-Eleven, stated Mr. Tabares had a "crazed look on his face" when entering the parking lot and "looked completely out of it." Shanon Forge, a nurse sitting in her car facing the 7-Eleven, thought Mr. Tabares looked "intimidating" and "intoxicated," possibly under the influence of PCP or methamphetamines. Another witness, Mike Martin, described Mr. Tabares as having "glazed over eyes" and possibly under the influence of drugs. Mr. Tabares eventually turned towards Officer Esparza while speaking loudly and aggressively.

Mr. Tabares then walked towards Officer Esparza in a confrontational manner with his fists clenched. Forge began

---

[3] Defendants challenge Roten's declaration as lacking foundation because he was across the street at the time of the shooting, though Roten was next to Mr. Tabares when Roten observed his possible mental health issues. But "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge" and "all justifiable inferences are to be drawn in [the non-movant's] favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) (citation omitted).

recording on her cell phone.**[4]**  Officer Esparza backed up on the sidewalk while instructing Mr. Tabares to stop, then tasered him with no visible effect.  Mr. Tabares then approached Officer Esparza and punched him in the face. The two began to fight, and Officer Esparza appeared to put Mr. Tabares in a headlock.  After several seconds, the two ended up on the ground.  Another witness, Timothy Newtson, began to film video.

Officer Esparza was on top of Mr. Tabares while he resisted with his back on the ground.  Officer Esparza struck Mr. Tabares several times; Mr. Tabares did not strike Officer Esparza.  Mr. Tabares grabbed at Officer Esparza's belt while Officer Esparza repeated "let go of the gun."  Officer Esparza felt Mr. Tabares take an item from Officer Esparza's belt, which turned out to be his police flashlight.  Officer Esparza stood, drew his gun, and separated from Mr. Tabares, as his body camera started recording.  Officer Esparza retreated about 15 feet away and saw Mr. Tabares holding what Officer Esparza should have known was his flashlight.

Mr. Tabares stood with his left side turned slightly towards Officer Esparza while holding the flashlight in his right hand.  Three seconds after separating 15 feet, Officer Esparza shot Mr. Tabares six times, shouted "get down"

---

**[4]** Where, as here, multiple videos captured the shooting with "no allegations or indications that [they were] doctored or altered in any way, nor any contention that what [they] depict[] differs from what actually happened," we "allow the videotape[s] to speak for [themselves]." *Scott v. Harris*, 550 U.S. 372, 378 & n.5 (2007).  However, "[t]he mere existence of video footage of the incident does not foreclose a genuine factual dispute as to the reasonable inferences that can be drawn from that footage." *Vos v. City of Newport Beach*, 892 F.3d 1024, 1028 (9th Cir. 2018) (citing *Scott*, 550 U.S. at 380).

twice, then shot him a seventh time after he stumbled from the gunshots.  Mr. Tabares slumped to the ground—dead.

Ms. Tabares, individually and as successor-in-interest to her son, filed a complaint in federal district court alleging 42 U.S.C. § 1983 claims, including for excessive force under the Fourth Amendment, and California claims for battery, negligence, and a Bane Act violation.  The district court granted summary judgment on all claims for Defendants Officer Esparza and the City of Huntington Beach. *Tabares v. City of Huntington Beach*, No. 8:18-CV-00821-JLS-JDE, 2019 WL 4455999 (C.D. Cal. July 30, 2019).  In a three-sentence paragraph, the district court rejected Ms. Tabares's negligence claim "for the same reasons" it rejected her federal claims, "*to wit*, that Esparza did not properly identify Tabares's mental illness or establish cause to initiate a stop." *Id.* at \*10.  Relying on *Billington v. Smith*, 292 F.3d 1177 (9th Cir. 2002), the district court held that "after multiple ignored warnings and nearly a minute of sustained combat, Esparza is objectively entitled to th[e] inference" that "no amount of warnings or non-lethal means will succeed in safely subduing a suspect." *Id.* at \*9.  Ms. Tabares appeals only her negligence claim.

## II

"We review de novo the district court's order granting summary judgment and its interpretation of state law." *Diaz v. Kubler Corp.*, 785 F.3d 1326, 1329 (9th Cir. 2015) (internal citations omitted).  We "view the facts and draw reasonable inferences in the light most favorable to the party opposing the summary judgment motion." *Scott*, 550 U.S. at 378 (alterations removed) (internal quotation marks and citations omitted).  But any dispute about the facts must be "genuine" and not "blatantly contradicted by the record, so

that no reasonable jury could believe it." *Id.* at 380; *see also* Fed. R. Civ. P. 56(c).

"When interpreting state law, we are bound to follow the decisions of the state's highest court, and when the state supreme court has not spoken on an issue, we must determine what result the court would reach based on state appellate court opinions, statutes and treatises." *Diaz*, 785 F.3d at 1329 (cleaned up). "We will ordinarily accept the decision of an intermediate appellate court as the controlling interpretation of state law," *Tomlin v. Boeing Co.*, 650 F.2d 1065, 1069 n.7 (9th Cir. 1981), "unless the federal court finds convincing evidence that the state's supreme court likely would not follow it," *Ryman v. Sears, Roebuck & Co.*, 505 F.3d 993, 994 (9th Cir. 2007). To affirm here, we must decide based on the record before us that a verdict in favor of Defendants is the only conclusion a reasonable jury could reach. *See Anderson*, 477 U.S. at 248.[5]

### III

### A

We first compare the contours of California negligence law governing an officer's use of deadly force with the Fourth Amendment standard. Under California negligence law, "a plaintiff must show that the defendant had a duty to use due care, that he breached that duty, and that the breach was the proximate or legal cause of the resulting injury."

---

[5] Defendants argue that Ms. Tabares is collaterally estopped from appealing the district court's order granting summary judgment to Defendants on her state law claim. Our de novo review means we are not bound or estopped by the district court's interpretations of the law. Nor is the grant of summary judgment here a finding of fact. *See Anderson*, 477 U.S. at 250.

*Hayes*, 305 P.3d at 255 (cleaned up). And "officers have a duty to act reasonably when using deadly force." *Id.* at 256 (citations omitted). "[T]he 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* at 258 (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)).[6] The officer's conduct must only "fall[] within the range of conduct that is reasonable" viewed "in light of the totality of circumstances." *Id.* at 256, 258 (citation omitted).

Officers are liable "if the tactical conduct *and decisions leading up to the use of deadly force* show, as part of the totality of circumstances, that the use of deadly force was unreasonable." *Id.* at 254 (emphasis added). Under California law, the officer's pre-shooting decisions can render his behavior unreasonable under the totality of the circumstances, even if his use of deadly force at the moment of shooting might be reasonable in isolation. *See, e.g.*, *Mendez v. Cnty. of Los Angeles*, 897 F.3d 1067, 1082–83 (9th Cir. 2018); *Grudt v. City of Los Angeles*, 468 P.2d 825, 831 (Cal. 1970). Federal law, however, generally focuses on the tactical conduct at the time of shooting, *see Scott v. Henrich*, 39 F.3d 912, 914 (9th Cir. 1994), though a prior

---

[6] Defendants note there was an arrest warrant for Mr. Tabares's failure to report to parole and that he may have been involved in the murder of Richard Darland. However, Officer Esparza admits he did not know or have reason to suspect these facts before interacting with Mr. Tabares, so they are irrelevant to the reasonableness analysis here. *See Glenn v. Washington Cnty.*, 673 F.3d 864, 872, 873 n.8 (9th Cir. 2011) ("We cannot consider evidence of which the officers were unaware—the prohibition against evaluating officers' actions 'with the 20/20 vision of hindsight' cuts both ways." (quoting *Graham*, 490 U.S. at 396)).

constitutional violation may proximately cause a later excessive use of force, *Mendez*, 897 F.3d at 1076–82.

Thus, California negligence law regarding the use of deadly force overall is "'broader than federal Fourth Amendment law.'" *Villegas ex rel. C.V. v. City of Anaheim*, 823 F.3d 1252, 1257 n.6 (9th Cir. 2016) (quoting *Hayes*, 305 P.3d at 263).[7]

California courts do generally use "[t]he same consideration" as federal law in assessing an officer's *tactical conduct at the time of shooting* as part of the totality of the circumstances. *Hernandez*, 207 P.3d at 515.

---

[7] Defendants argue for the first time on appeal that "[t]here can be no civil liability under California law as the result of a justifiable homicide" under Cal. Penal Code § 196 (2019). *See Martinez v. Cnty. of Los Angeles*, 47 Cal. App. 4th 334, 349 (Ct. App. 1996). Under this theory of immunity, they assert an officer may "'press forward and make the arrest, using all the force [reasonably] necessary to accomplish that purpose.'" *See Hernandez v. City of Pomona*, 207 P.3d 506, 519 (Cal. 2009) (citations omitted). But this new argument boils down to the same issue litigated here: whether Officer Esparza's conduct was objectively reasonable or not. Therefore, it is not necessary to address this argument separately from the analysis under *Hayes*, even were it not waived. *See Mashiri v. Epsten Grinnell & Howell*, 845 F.3d 984, 988–89 (9th Cir. 2017).

Separately, there is no "qualified immunity under California law" comparable to federal § 1983 jurisprudence. *Venegas v. Cnty. of Los Angeles*, 153 Cal. App. 4th 1230, 1249 (Ct. App. 2007); *see also Mendez*, 897 F.3d at 1083–84 (rejecting claims of immunity in negligence claims under California Government Code § 821.6, which is limited to malicious-prosecution claims, and California Government Code § 820.2, which "applies only to policy decisions, not to operational decisions"); *Conway v. Cnty. of Tuolumne*, 231 Cal. App. 4th 1005, 1015 (Ct. App. 2014) ("[D]iscretionary immunity does not apply to . . . using unreasonable force when making an arrest or overcoming resistance to it." (citations omitted)).

California courts consider "the severity of the crime at issue, whether the plaintiff posed a reasonable threat to the safety of the officer or others, and whether the plaintiff was actively resisting detention or attempting to escape." *Id.*

Under federal law, deadly force can be "reasonable only if 'the officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others.'" *Henrich*, 39 F.3d at 914 (emphasis omitted) (quoting *Tennessee v. Garner*, 471 U.S. 1, 3 (1985)). "Other relevant factors include the availability of less intrusive alternatives to the force employed, whether proper warnings were given and whether it should have been apparent to officers that the person they used force against was emotionally disturbed." *Glenn*, 673 F.3d at 872. "Even when an emotionally disturbed individual is 'acting out' and inviting officers to use deadly force to subdue him, the governmental interest in using such force is diminished by the fact that the officers are confronted . . . with a mentally ill individual." *Deorle v. Rutherford*, 272 F.3d 1272, 1283 (9th Cir. 2001).

## B

Against this backdrop, the district court made three errors. First, it inaccurately concluded that Ms. Tabares did "not point to *any* evidence probative of the fact that [Mr.] Tabares exhibited symptoms of mental illness that would have been apparent to Esparza." *Tabares*, 2019 WL 4455999 at \*6. In doing so, the district court "fail[ed] to credit evidence that contradicted some of its key factual conclusions" and "improperly weighed the evidence and resolved disputed issues in favor of the moving party." *Tolan v. Cotton*, 572 U.S. 650, 657 (2014) (alterations adopted) (internal quotation marks and citation omitted).

Second, the district court conflated the broader California negligence standard regarding pre-shooting conduct with the Fourth Amendment standard.[8] *Tabares*, 2019 WL 4455999 at \*10. It did not consider that a jury could find Officer Esparza's pre-shooting conduct unreasonable under California law, given Mr. Tabares's potential mental illness.

And third, the district court misinterpreted Ninth Circuit precedent in assessing the reasonableness of Officer Esparza's conduct at the time of the shooting. It essentially concluded that California law precludes negligence when an officer fights with an unarmed man, retreats 15 feet, and then shoots the stationary man holding a flashlight seven times without warning. *Id.* at \*7, \*9. Neither federal law governing tactical conduct, nor California law looking at the same tactical considerations as federal law, supports such a conclusion.

1

We turn to the first issue. The record, including declarations by two former police officers and Azevedo's

---

[8] Defendants argue that Ms. Tabares presents a "new theory of pre-shooting negligence" on appeal that was waived by failing to bring it before the district court. But Defendants acknowledge that below, Ms. Tabares noted that California negligence law is broader than federal law in excessive force and cited *Hayes*, 305 P.3d 252. The district court recognized this argument. *Tabares*, 2019 WL 4455999 at \*10. And Defendants would not "have tried [the] case differently either by developing new facts in response to or advancing distinct legal arguments against the issue." *Janes v. Wal-Mart Stores Inc.*, 279 F.3d 883, 888 n.4 (9th Cir. 2002) (citation omitted). Even assuming this argument was not raised, "the pertinent record has been fully developed" and Defendants suffer no prejudice since they responded in their Answering Brief. *See Mashiri*, 845 F.3d at 988–89.

testimony, shows a reasonable jury could find that Officer Esparza should have suspected Mr. Tabares could have mental health issues.

Roten, an eyewitness and former police officer, believed Mr. Tabares may have had mental health issues because he was talking to himself and gesturing with his hands. Officer Esparza observed Mr. Tabares at the same time Roten observed these behaviors. Officer Esparza cited Mr. Tabares's unusual behavior, including his hand gestures, as a reason for stopping him.

Roger Clark, a 27-year veteran of the Los Angeles County Sheriff's Department who retired as a Lieutenant, submitted an expert declaration supporting this conclusion. Clark references California's Peace Officer Standards and Training ("P.O.S.T.") "applicable to all state police officers," which could be used by a "rational jury . . . in assessing whether the officer['s] use of force was unreasonable." *Smith v. City of Hemet*, 394 F.3d 689, 703 (9th Cir. 2005) (citation omitted); *see also People v. Sibrian*, 3 Cal. App. 5th 127, 136 (Ct. App. 2016) ("[E]xpert testimony on the use of force has often been admitted in California excessive force cases without objection." (citations omitted)).

Based on his review of the evidence, including relevant videos, Roten's declaration, and the police incident report, Clark concluded that "[a] reasonable officer in Officer Esparza's position acting with consistent standard police practices would have known or should have known that Mr. Tabares was mentally ill," because "[o]fficers are trained to recognize indicators of mental illness, such as: fearful or inappropriate behavior, excitability, and disorganized speech and thought patterns." Further,

Azevedo stated that Mr. Tabares looked "out of it" and "crazed" prior to the shooting.

Considering all evidence in the light most favorable to Ms. Tabares, a reasonable jury could conclude that Officer Esparza should have suspected Mr. Tabares had mental health issues, based on P.O.S.T. and Officer Esparza's observations similar to those of other witnesses who believed Mr. Tabares had mental health issues. *See, e.g.*, *Vos*, 892 F.3d at 1029, 1034. The district court improperly "credited the evidence of the party seeking summary judgment and failed properly to acknowledge key evidence offered by the party opposing that motion." *Tolan*, 572 U.S. at 659; *see also id.* at 660 ("[G]enuine disputes are generally resolved by juries in our adversarial system.").

2

Second, the district court conflated Fourth Amendment excessive force standards with California negligence law. California negligence law overall is "'broader than federal Fourth Amendment law'" in excessive force cases. *Villegas*, 823 F.3d at 1257 n.6 (quoting *Hayes*, 305 P.3d at 263). In California, an officer's pre-shooting decisions can make his later use of force unreasonable under the totality of the circumstances. *See Mendez*, 897 F.3d at 1082–83; *Grudt*, 468 P.2d at 831. In this case, a juror could find Officer Esparza unreasonably failed to follow police protocol dealing with potentially mentally ill persons before using force. Officer Esparza's "failure to follow a safety rule promulgated by his employer, regardless of its substance, serves as evidence of negligence." *Grudt*, 468 P.2d at 831 (citation omitted); *see also People v. Brown*, 245 Cal. App. 4th 140, 171 (Ct. App. 2016) ("[O]fficer training and tactics can potentially be relevant for purposes of tort liability.").

Ample evidence supports that Officer Esparza potentially failed to deescalate the situation per P.O.S.T. regarding potentially mentally ill individuals. For instance, Clark stated that Officer Esparza "failed to respond as taught by P.O.S.T., which states that the appropriate tactical actions officers should do when confronted with a mentally ill individual is [sic] to request backup, calm the situation, avoid physical contact, determine if the person is taking medication, acknowledge the person's feelings, and not to make threats." Before interacting with Mr. Tabares, Officer Esparza had no reason to suspect Mr. Tabares was dangerous, had a weapon, or had committed a crime. But Officer Esparza knew in advance that Mr. Tabares was acting strangely. And, as Clark stated, Officer Esparza should have used reasonable and generally accepted police practices to deal with Mr. Tabares. *Cf. City of Hemet*, 394 F.3d at 703 (holding a "rational jury could rely upon" evidence "that the officers' conduct violated applicable police standards and that there were alternative techniques available for subduing him that presented a lesser threat of death or serious injury" when "assessing whether the officers' use of force was unreasonable").[9]

3

Finally, Officer Esparza's decision to shoot Mr. Tabares without warning six times—and then a seventh—could be found by a jury to be unreasonable. The district court's

---

[9] Separately, Ms. Tabares argues there was no reasonable suspicion for the stop and that this "further made the manner of the attempted detention unreasonable." The district court decided there was no Fourth Amendment violation because Mr. Tabares was not unreasonably detained. *Tabares*, 2019 WL 4455999 at \*4–\*5. But even if the officers' alleged pre-shooting negligence does not establish a constitutional violation, it may establish negligence under California law.

holding to the contrary is based on a misreading of *Billington*, 292 F.3d 1177, and imputes this misreading of Ninth Circuit precedent directly into the broader California negligence analysis.

The Roten and Clark declarations place in material dispute any immediate or serious threat to Officer Esparza at the time of the shooting. Roten "certainly would not have shot the subject if [he] were the officer" because there was no "immediate" or "serious threat posed to the officer at the time of the shots." Roten believed Mr. Tabares "looked tired and looked like he was done with the struggle." He noted that officers are "trained that deadly force should only be used as a last resort" and "this situation did not come close to necessitating the use of deadly force." True, Roten did not observe Mr. Tabares holding Officer Esparza's flashlight. Regardless, drawing "all justifiable inferences" of the evidence in favor of Ms. Tabares, Roten's testimony supports that Mr. Tabares may not have posed a threat at the time of shooting based on his demeanor. *See Anderson*, 477 U.S. at 255.

According to Clark, Officer Esparza did not respond according to P.O.S.T. Officer Esparza would have told Mr. Tabares to "drop it" if he thought Mr. Tabares had a knife. Further, Clark believed it "was not an immediate defense of life situation," because "Officer Esparza had less than lethal options available to him at the time of the shooting" and "[a] reasonable officer in Officer Esparza's position would have known or should have known that Mr. Tabares was holding the officer's flashlight." The district court thus correctly held that a reasonable dispute of material fact existed and a jury could infer that Officer Esparza should have known it was a flashlight, not a knife. *See id.*; *Tabares*, 2019 WL 4455999 at *7.

Officer Esparza's failure to give Mr. Tabares a warning or instruct him to put his hands up, drop the item, or freeze could be considered unreasonable by a jury. A failure to warn before using deadly force could be unreasonable unless impracticable. *Harris v. Roderick*, 126 F.3d 1189, 1201 (9th Cir. 1997). The evidence supports that Mr. Tabares was "done with the struggle." Moreover, after his sixth shot, Officer Esparza waited a few seconds and told Mr. Tabares, "get down," before firing a seventh shot, suggesting he could have warned him before his first shot.

The use of deadly force may also be unreasonable apart from any warning if Mr. Tabares did not "pose[] a significant threat of death or serious physical injury to the officer or others" at the time of shooting. *Henrich*, 39 F.3d at 914 (internal quotation marks and citation omitted); *see also Deorle*, 272 F.3d at 1281 (holding an officer's actions could be unreasonable if they resulted from "[a] desire to resolve quickly a potentially dangerous situation" rather than an immediate threat). A reasonable jury could find the video evidence does not show that Mr. Tabares, 15 feet away and stationary, posed a significant immediate threat to Officer Esparza or any bystanders. *Cf. Martinez*, 47 Cal. App. 4th at 345 (holding there *was* a threat where the suspect had stated he intended to kill the police officer, was indisputably armed with a knife, and continually advanced to within ten feet despite warnings).

The district court misread *Billington* in deciding an immediate significant threat existed. In *Billington*, Detective Smith, a police officer, was grappling over control of a gun with Hennessey, the decedent. We held Detective Smith "could have reasonably shot Hennessey even if he had just pushed Hennessey back a few feet." 292 F.3d at 1185. Here, the district court found that "hypothetical posed . . .

describes precisely what happened." *Tabares*, 2019 WL 4455999 at *8. But that hypothetical is *not* what happened here.

Rather, the factual dispute over the distance between Detective Smith and Hennessey in *Billington* was "immaterial . . . because either way, Detective Smith was locked in hand-to-hand combat and losing." 292 F.3d at 1185. The witness who testified that Smith and Hennessey were separated by several feet also stated "Hennessey was charging Detective Smith when he shot Hennessey" and "at the moment of the shooting, [Hennessey] had raised his right hand to hit Detective Smith again." *Id.* at 1182. And the powder residue showed that "Hennessey was shot from a distance of eight to fourteen inches." *Id.* Even if separated by a few feet, Hennessey and Detective Smith were "locked in combat" because Hennessey was charging and about to hit Detective Smith. *Id.* at 1185.

Here, Officer Esparza was not "locked in hand-to-hand combat" with Mr. Tabares at the time of the shooting. Uncontroverted video evidence shows that Mr. Tabares was not charging Officer Esparza, nor was he attempting to hit (nor had the capacity to hit) Officer Esparza after the initial scuffle. Rather, Mr. Tabares was standing still 15 feet away—much farther than the distance of eight to fourteen inches in *Billington*. Mr. Tabares moved only after six shots were fired, taking one step off the curb to steady himself before a seventh shot was fired and he crumpled to the ground.[10]

---

[10] Defendants' counsel asserts that Mr. Tabares was moving towards Officer Esparza before the shooting. But the video evidence taken from

Even as a matter of federal law, much less of California law, *Billington* does not mean "after multiple ignored warnings and nearly a minute of sustained combat, Esparza [was] objectively entitled to" infer "that no amount of warnings or non-lethal means will succeed in safely subduing" Mr. Tabares standing still 15 feet away. *See Deorle*, 272 F.3d at 1282 (holding a non-deadly beanbag round was an unreasonable excessive use of force where "[t]here was no immediate need to subdue" a threatening suspect); *Glenn*, 673 F.3d at 867–68, 874 (holding similarly); *contra Tabares*, 2019 WL 4455999 at *9.

Finally, a reasonable jury could find Officer Esparza's firing seven shots to be unreasonable, even had an initial threat existed. *See Zion v. Cnty. of Orange*, 874 F.3d 1072, 1076 (9th Cir. 2017) (holding "a reasonable officer would reassess the situation rather than continue shooting" if the suspect ceased to be a threat). After six shots, the only command Officer Esparza gave Mr. Tabares was, "get down," and Officer Esparza did not give Mr. Tabares any time to understand or comply with the command before firing the seventh shot. Neither Roten nor Clark believed a threat existed at the time of the shooting. Thus, a jury could find that the number of shots, particularly the seventh, was unreasonable.

## IV

We appreciate and respect the great challenges that law enforcement and first responders face daily in selflessly

---

multiple angles shows that Mr. Tabares was not; rather, Mr. Tabares took a step *away* from Officer Esparza, if he moved at all. Defendants' version of events is "blatantly contradicted by the record." *See Scott*, 550 U.S. at 380.

carrying out their duties. We do not judge Officer Esparza's behavior "with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396. Indeed, we acknowledge the severe stress that can result from situations where an officer may feel his safety is at risk. Ultimately, we do not "hold that a reasonable jury *must* find in favor of the plaintiff[] on this record, only that it *could*." *Gonzalez v. City of Anaheim*, 747 F.3d 789, 797 (9th Cir. 2014) (en banc) (emphases added). We merely reiterate that under California's broad formulation of negligence, Ms. Tabares's negligence claim survives summary judgment.[11]

**REVERSED AND REMANDED.**

---

[11] The district court is "free on remand to decline to exercise supplemental jurisdiction over the state-law claim[] and allow plaintiff[] to bring [it] in state court." *Depot, Inc. v. Caring for Montanans, Inc.*, 915 F.3d 643, 668–69 (9th Cir. 2019); *see also* 28 U.S.C. § 1367(c)(3).